IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

DANNY BRICENO SOLANO,

     Petitioner,

v.             CIVIL ACTION NO.   2:26-cv-00045

CHRISTOPHER MASON, et al.,

     Respondents.

**MEMORANDUM OPINION AND ORDER**

The law is clear: all persons present within our country are entitled to due process.   The plain text of our Constitution says this explicitly.

Due process can mean various things to different people.   To the ignorant, it may be a totally unfamiliar term with no meaning.   To those who know little more than what it took to pass high school civics (such as it's been in recent years), it may be a term vaguely associated with government, also with little meaning.   To informed nonlawyers it is better understood but still an abstraction.   To lawyers and judges, it is a bedrock principle of our Constitution, nation, and freedoms, yet we nonetheless often treat it with clinical detachment.   However, for a person deprived of their liberty without due process, it can be the most important thing in their life, and its denial the worst that has ever happened to them.   Everyone is entitled to due process, but, unfortunately, not everyone has received it.

Why should we care about other people not getting due process?   We are all ultimately the government—its authority is derived from "we the people," and it is accountable to us for its conduct.   Thus, when it deprives a person of due process, we are, in a very real sense, all responsible.   What, then, has become of "[d]o to others as you would have them do to you"?[1]

Putting this in more immediate terms, due process requires adequate notice and a meaningful hearing to determine whether a seizure is legally correct and based on accurate facts.   If the government may simply seize *someone* without due process, there is no check on its ability to seize *anyone*.

One might say, "I don't care because that only happens to THOSE people."   Perhaps.   But what if someone here legally, or even a United States citizen, is afforded no due process after being seized by mistake?   *Or by a choice?*

Fortunately, our Constitution demands more, including the rule of law, as opposed to the rule of unchecked executive fiat.

At a very basic level, it is obviously true that laws consist of words, and, therefore, words matter.   They have meaning, which in the context of the law, ensures predictability, stability, and fairness in application.[2]   Consequently, the meaning of words in statutes does not and cannot change to justify the "unenacted will" of the government to unlawfully detain individuals without due process.[3]   For this reason, which is discussed more fully below, the pending Petition for Writ of Habeas Corpus, (ECF No. 1), is **GRANTED**.

---

[1] *Luke* 6:31; *see also Matthew* 7:12 ("So in everything, do to others what you would have them do to you, for this sums up the Law and the Prophets.").

[2] *See, e.g.*, *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 276 (2013) ("[I]t is important to have a uniform interpretation of federal law."); *see also Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005) (recognizing "the basic principle of justice that like cases should be decided alike").

[3] *See King v. Burwell*, 576 U.S. 473, 515 (2015) (Scalia, J.) (dissenting) ("[O]urs is a government of laws and not of men. That means we are governed by the terms of our laws, not by the unenacted will of our lawmakers."); *Lamie v.*

## I.    BACKGROUND

Petitioner Danny Briceno-Solano ("Petitioner") is just one of many individuals who were all arrested and detained by Immigration Customs and Enforcement ("ICE") officers within a few days of each other while travelling on Interstate 77.   (ECF No. 1 at 4, ¶ 18; *see also, e.g.*, *Larrazabal-Gonzalez v. Mason*, No. 2:26-CV-00049, 2026 WL 221706, at *2 (S.D. W. Va. Jan. 28, 2026) (detained on January 13, 2026); *Flores v. Mason*, No. 2:26-CV-00044, 2026 WL 227010, at *1 (S.D. W. Va. Jan. 28, 2026) (detained January 13, 2026); *Mehari v. Mason*, 2:26-cv-00039 (S.D. W. Va.) (ECF No. 1 at 3, ¶ 9) (detained January 13, 2026); *Gonzalez v. Aldridge*, 3:26-cv-00055 (S.D. W. Va.) (ECF No. 1 at 4, ¶ 16) (detained January 18, 2026).   Specifically, Petitioner was pulled over on January 11, 2026, because his vehicle had "unclear, paper license plates."   (ECF No. 15-6 at 3.)   Although he had no criminal history, no outstanding warrants, and no history of gang affiliation, ICE arrested Petitioner because he had "no documentation" allowing him to reside in the United States and was allegedly here in violation of the Immigration and Nationality Act ("INA").   (*Id.*)

That is not true, though.   Petitioner is a citizen and national of Venezuela and a noncitizen resident of the United States.   (ECF No. 1 at 4, ¶ 15.)   After facing tortuous conditions in his home country, Petitioner fled to the United States.   (*See id.* at 16, 17.)   Once here, he was apprehended by the United States Border Patrol near Laredo, Texas on June 15, 2022.   (ECF No. 15-2 at 4.)   The Border Patrol Agent determined that Petitioner had unlawfully entered the United

---

*U.S. Tr.*, 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform to its intent."); *Missouri Pac. R. Co. v. United States*, 271 U.S. 603, 607 (1926) ("In a sense, words do not change their meaning."); *accord* Jennifer Senior, *In Conversation: Antonin Scalia* , New  York  Magazine (Oct.  4,  2013),  https://nymag.com/news/features/antonin-scalia-2013-10/ ("Words have meaning. And their meaning doesn't change.").

States, and Petitioner was transported to the Laredo Sector Enhanced Centralized Processing Center for further processing.    (*Id.*)    Once there, Petitioner was released into the United States on an Order of Release on Recognizance,[4] pursuant to 8 U.S.C. § 1226.    (*See id.* at 6; ECF No. 15-7 at 2.)

After being lawfully released in the United States, Petitioner settled into a productive and meaningful life for years.    He applied for and received Temporary Protected Status ("TPS"),[5] (*see* ECF No. 1-1); an Employment Authorization Document, also known as a work permit, (*see* ECF No. 1-2); and a North Carolina driver's license, (ECF No. 1-3).    Petitioner is employed as a contractor and pays his taxes.    (ECF No. 1 at 4, ¶ 16.)    He is a husband and a father and resides in the United States with his family.    (*Id.*)

Petitioner adhered to the INA after his entry into the United States, including by participating in the removal proceedings that were initiated against him.    Petitioner attended all hearings, (*see* ECF No. 22), and filed a *pro se* application for asylum and withholding of removal under section 241(b)(3) of the INA, and protection under the Convention Against Torture, based on persecution he suffered in Venezuela, including kidnapping in Zulia at the hands of a guerrilla group associated with the Venezuelan government, (ECF No. 1 at 4, ¶ 17).    Those proceedings were ultimately voluntarily dismissed by the Department of Homeland Security ("DHS") on January 7, 2026.    (ECF No. 15-5 at 2.)

---

[4]  The Court notes that Respondents did not produce this document.    The record indicates that Border Patrol also gave Petitioner a Notice of Custody Determination, (Form I-286), (ECF No. 15-2 at 6), a Notice to Appear for removal proceedings (Form I-862), (ECF No. 15-3), and a change of address form for the Immigration Court (Form EOIR-33), (*see* ECF No. 15-2 at 5).
[5]  The Government notes that Respondent Noem vacated and terminated Venezuela's TPS designation on February 1, 2025.    *See* 90 Fed. Reg. 9041–42 (terminating the 2023 Designation, which was set to expire on October 2, 2026). However, the Ninth Circuit recently held that Respondent Noem exceeded her statutory authority in doing so.    *Nat'l TPS All. v. Noem*, --- F.4th ----, 2026 WL 226573, at *1 (9th Cir. Jan. 28, 2026).

Nevertheless—just *four days* later—ICE detained Petitioner on the side of Interstate 77, allegedly pursuant to 8 U.S.C. § 1225.   Petitioner was transported to the Southern Regional Jail in Beaver, West Virginia.   (ECF No. 15-6 at 3.)   He was then transported to the South Central Regional Jail ("SCRJ") in Charleston, West Virginia.   (ECF No. 1 at 1, ¶ 1.)

To date, Petitioner remains in civil detention at SCRJ, along-side those facing criminal charges and convicted criminals.   (*See* ECF No. 1 at 5, ¶ 19 (claiming that his detention is "civil and administration in nature" and is "not based on any criminal conviction or charge").)   To date, Petitioner has not had an administrative judge or neutral decisionmaker determine that his confinement is justified based on an individual assessment.   (*See id.* at 5–6*, ¶¶ 21–24, 27–28.)

Instead, *four days after Petitioner had already been detained*, ICE issued an arrest warrant against Petitioner.   (*See* ECF No. 15-7 at 2.)   ICE also issued Petitioner a Notice of Appearance for yet another removal proceeding, just nine days after DHS had voluntarily dismissed Petitioner's initial removal proceedings.   (*See* ECF No. 15-8.)   To make matters worse, the first hearing was scheduled for January 29, 2026—*eighteen days* after he was detained.   (*See id.*)

Consequently, Petitioner filed the pending Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 (the "Petition"), which identified Christopher Mason, as the Superintendent of SCRJ (the "State Respondent"), as a respondent, as well as Michael Rose ("Rose"), the Acting Field Office Director of the Philadelphia Field Office of ICE; Todd Lyons ("Lyons"), the Acting Director of ICE; Kristi Noem ("Noem"), the Secretary of Homeland Security; and Pamela Bondi ("Bondi"), the United States Attorney General, (collectively the "Government").   (ECF No. 1.) The Petition alleges that his detention violates the Fifth Amendment Due Process Clause, the Fifth Amendment Equal Protection Clause, the INA, the Administrative Procedure Act, and the

Suspension Clause of the United States Constitution. (*Id.*) Petitioner seeks immediate release from custody or, in the alternative, an order "directing Respondents to provide him with a constitutionally adequate custody hearing." (*Id.* at 1–2.)

Petitioner then filed an Expedited Motion to Set a Show Cause Hearing, (ECF No. 5), which the Court granted, (ECF No. 10). Pursuant to the Court's Show Cause Order, both the State Respondent and the Government filed respective responses to the Petition. (*See* ECF Nos. 14, 15.) Of relevance, the Government moved to dismiss the Petition for lack of jurisdiction and failure to state a claim. (ECF No. 15-1.) Petitioner then filed a Reply, (ECF No. 18-1), and several filings with supplemental information, (ECF Nos. 20, 23–24.)

On January 28, 2026, the Court held a show cause hearing on the Petition (the "Show Cause Hearing"). (ECF No. 22.) Respective counsel for Petitioner and all respondents appeared and were permitted to present arguments.[6] As such, this issue is fully briefed and ripe for adjudication.

## II.    LEGAL STANDARD

The Constitution guarantees that the writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). The "heart of habeas corpus" is the challenge to a petitioner's confinement (or the duration of his confinement), where he seeks "immediate release or a speedier release from that confinement." *Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973). Thus, to be clear, "habeas corpus is a broad, independent writ designed to address challenges to any illegal custody," *Wall v. Kiser*, 21 F.4th 266, 273 (4th Cir. 2021), including those "by executive direction," *Preiser*, 411 U.S. at 484.

---

[6] The State Respondent's Response to the Court's Show Cause Order makes no argument other than that he "defers to the Federal Respondents' position," (ECF No. 14), and his counsel did not present any argument at the Show Cause Hearing.

6

Thus, non-citizens may use the writ in immigration-related matters where no other statutory mechanism for review is provided. *See Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001). Indeed, challenges to present immigration confinement "fall within the 'core' of the writ of habeas corpus." *Trump v. J. G. G.*, 604 U.S. 670, 672 (2025) (quoting *Nance v. Ward*, 597 U.S. 159, 167 (2022)).

Section 2241 of Title 28 confers the federal courts with the power to issue writs of habeas corpus to persons "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Torrence v. Lewis*, 60 F.4th 209, 213 (4th Cir. 2023) ("A federal court may grant habeas relief only on the ground that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States." (internal citations and brackets omitted)). After receiving the petition and any response thereto, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243. The petitioner bears the burden of proving that he is being held contrary to law by a preponderance of the evidence. *Walker v. Johnston*, 312 U.S. 275, 286 (1941) ("On a hearing [the § 2241 petitioner has] the burden of sustaining his allegations by a preponderance of evidence.").

## III.    DISCUSSION

This case arises out of a dispute over immigration statutes, specifically as to whether the mandatory detention statute, 8 U.S.C. § 1225, or the discretionary detention statute, 8 U.S.C. § 1226, applies to Petitioner. Petitioner contends that § 1226 applies, which entitles him to a bond hearing, but the Government insists that Petitioner is detained under § 1225, which does not entitle him to a bond hearing. That dispute is the foundation of Petitioner's due process claim. In its

Motion to Dismiss, the Government also raises the issue of subject matter jurisdiction.   (ECF No. 15-1.)

The Court notes that these issues have already been thoroughly addressed by courts throughout the country, and, as discussed below, the Government's arguments have been consistently rejected as contrary to established law.   Curiously, though, the Government evidently found it prudent to assert those same arguments before this Court.   Thus, to ensure that the Government understands why these arguments fail, the Court will provide exhaustive explanations below, which will hopefully preserve judicial resources and shorten the time individuals spend in unlawful custody in future cases.   Before the Court engages in that endeavor, though, it is evidently necessary to recall some very basic legal principles.

To start, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).   To that extent, Supreme Court precedent is binding on all lower Courts. *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (directing that, if a Supreme Court precedent directly controls, "yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions" (quotation marks omitted)); *United States v. McDowell*, 745 F.3d 115, 124 (4th Cir. 2014) ("[Courts] may not disregard [Supreme Court precedent] unless and until the Supreme Court holds to the contrary."). Similarly, absent any contrary Supreme Court authority, decisions by the Fourth Circuit Court of Appeals are binding on all lower courts within the Fourth Circuit, including this one.   *Carrera v. E.M.D. Sales Inc.*, 75 F.4th 345, 352 (4th Cir. 2023) ("[A]bsent contrary law from an *en banc* or Supreme Court decision," Fourth Circuit precedent remains binding); *United States v. Brown*, 67

F.4th 200, 212 (4th Cir. 2023) ("Until the Supreme Court . . . limits or overrules [Fourth Circuit precedent], [courts] are bound to apply it.").

If there is no direct binding authority on an issue, lower courts are to use statutory interpretation to determine the meaning of the law.   This process starts with "the language of the statute itself."   *United States v. Weaver*, 659 F.3d 353, 356 (4th Cir. 2011) (internal citation omitted).   If "the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms."   *Lamie*, 540 U.S. at 534 (internal quotation marks omitted); *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir.2015) ("If the plain language is unambiguous, [a court] need look no further.").   "A statute is ambiguous if it 'lends itself to more than one reasonable interpretation,'" *Lee*, 800 F.3d at 631 (quoting *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir.2004)), and a court "determine[s] the 'plainness or ambiguity of statutory language . . . by reference to the language itself, . . . the specific context in which that language is used, and the broader context of the statute as a whole,'" *id.* (second and third alterations in original) (quoting *Yates v. United States*, 574 U.S. 528, 237 (2015)).

With these principles in mind, the Court addresses each of the parties' arguments below.

### A.  Subject Matter Jurisdiction

The judicial power of the federal courts extends to "Cases" and "Controversies" that arise under the Constitution and the laws of the United States.   U.S. Const. art. III, § 2.   In other words, the federal courts have "limited jurisdiction" and "possesses only that power authorized by the Constitution and statute."   *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under 28 U.S.C. § 2241 a United States District Court has jurisdiction to grant a writ of habeas corpus "to a prisoner . . . in custody in violation of the Constitution . . . of the United States."

Here, the Government contends that, despite § 2241's grant of jurisdiction, this Court lacks jurisdiction for four reasons. (*See* ECF No. 15-1.) Throughout its arguments, the Government consistently ignores the meaning of the words in the statutes upon which it relies, as well as binding Supreme Court precedent. Unsurprisingly, then, Petitioner disagrees. (*See* ECF No. 18-1.) Each of the Government's theories are discussed in turn below.

### 1. 8 U.S.C. § 1252(e)(3)

The Government first argues that 8 U.S.C. §§ 1252(e)(3) strips the Court of its jurisdiction. (ECF No. 15-1 at 9.) Section 1252(e)(3) provides, in pertinent part, as follows:

> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—
>
> (i)     whether such section, or any regulation issued to implement such section, is constitutional; or
>
> (ii)    whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

8 U.S.C. § 1252(e)(3)(A).

Here, the Government argues that Petitioner may only bring his claim in the United States District Court for the District of Columbia. (*Cf.* ECF No. 22 (claiming that Petitioner can also bring his claim in a federal circuit court of appeals).) The Government reasons that § 1252(e)(3) bars this Court's jurisdiction because Petitioner challenges DHS's determination that he is subject to the mandatory detention statute under 8 U.S.C. § 1225. (ECF No. 15 at 9.)

Section 1252(e)(3) does not say that. The plain language of § 1252(e)(3) makes clear that it governs jurisdiction over *systemic* challenges to § 1225. *See* 8 U.S.C. 1252(e)(3)(A) ("Judicial

review of determinations under section [8 USCS § 1225(b)] and its implementation is available in . . . the United States District Court for the District of Columbia[.]").    If this text, in isolation, was not plain enough, its title clarifies that it governs jurisdiction over "[c]hallenges on validity of the system."    8 U.S.C. § 1252(e)(3); *see Lee*, 802 F.3d at 631; *cf Lawson v. FMR LLC*, 571 U.S. 429, 465 (2014) ("[W]here the text is ambiguous, a statute's titles can offer 'a useful aid in resolving [the] ambiguity.'" (quoting *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 388–89, (1959))). Additionally, 8 U.S.C. § 1252(e)(3)(B) further clarifies that any challenges to § 1225(b) "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented."    This sixty-day challenge period evidences an intent to address only systemic challenges to § 1225(b), rather than as-applied challenges.    *See Lee*, 802 F.3d at 631; *cf. Doe v. Cooper*, 842 F.3d 833, 844 (4th Cir. 2016) (explaining that the doctrine of in pari materia instructs that "adjacent statutory subsections that refer to the same subject matter should be read harmoniously" (internal quotation marks omitted)).    Given this context, Section 1252(e)(3) plainly applies only to systemic challenges to 8 U.S.C. § 1225(b), as opposed to as-applied challenges.[7]

Also, to be clear, Petitioner does not bring a systemic challenge to § 1255.    Rather, Petitioner brings an individual as-applied challenge to his misclassification under § 1225(b),

---

[7] In fact, a majority of circuits, when discussing § 1252(e)(3), have found that it applies to systemic challenges.    *See, e.g., Grace v. Barr*, 965 F.3d 883, 892 (D.C. Cir. 2020) (finding that petitioners brought their challenge to the DHS Secretary's expedited-removal provisions within sixty days); *Shunaula v. Holder*, 732 F.3d 143, 147 (2d Cir. 2013) ("Insofar as Shunaula argues that his challenge falls within the exception created by § 1252(e)(3) for 'systemic' challenges to the expedited removal process, we are not persuaded. Shunaula . . . makes no argument on appeal, regarding the general nature of the expedited removal system."); *Castro v. United States Dep't of Homeland Sec.*, 835 F.3d 422, 427 (3d Cir. 2017) ("Section 1252(e) also provides jurisdiction to the district court for the District of Columbia to review '[c]hallenges [to the] validity of the [expedited removal] system.' . . .   Such systemic challenges include challenges to the constitutionality of any provision of the expedited removal statute[.]") (citations omitted); *Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1141n.5 (9th Cir. 2008) ("there is a separate statutory sub-section, 8 U.S.C. § 1252(e)(3), that allows a systemic challenge to the expedited removal process"); *Vaupel v. Ortiz*, 244 Fed. Appx 822, 895 (10th Cir. 2007) ("Thus, to the extent Mr. Vaupel raises a systemic challenge to the constitutionality of the expedited removal procedures, such a claim may not be brought in the courts in this circuit.").

arguing that § 1226 applies to him instead.  (*See* ECF No. 18-1 at 2.)  Thus, Section 1252(e)(3) does not strip this Court of jurisdiction.

### 2.  8 U.S.C. § 1252(g)

Under 8 U.S.C. § 1252(g), "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act."  8 U.S.C. § 1252(g).  The Supreme Court has long made clear that section 1252(g) does not apply "to *all* claims arising from deportation proceedings."  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (emphasis added).  Rather, "[t]he provision applies only to three discrete actions that the Attorney General may take," namely the Attorney General's "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders."  *Id.* (emphasis in original).  Beyond binding Supreme Court precedent, Congress's decision to list only these actions indicates its intent to allow district courts to maintain jurisdiction over habeas corpus challenges to present immigration confinement.  *Cf. Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.").

Here, the Government argues that § 1252(g) strips this Court of jurisdiction.  (ECF No. 15-1 at 9.)  Specifically, the Government argues that the DHS Secretary's decision to detain Petitioner pending his removal proceeding "squarely falls" within the jurisdictional bar pursuant to 8 U.S.C. § 1252(g).  (ECF No. 15-1 at 9–10 (relying on non-binding, out-of-district cases).)

However, the Government's liberal reading of § 1252(g) ignores the plain meaning of the statute and the Supreme Court's "narrow reading of the statute."  *Reno*, 525 U.S. at 487. Although ICE has initiated removal proceedings, Petitioner does not challenge the *commencement*

12

of these proceedings.  *Cf. Reno*, 525 U.S. at 482.    Rather, Petitioner challenges the constitutionality and legality of his detention during the period before his removal hearings.   (*See* ECF No. 18-1 at 3.)   In other words, Petitioner challenges one of the "many other decisions or actions that may be part of the deportation process."  *Id.*; *see also Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *7 (4th Cir. July 1, 2025) ("[T]he Supreme Court specifically rejected the idea that § 1252(g) stripped federal courts of jurisdiction over habeas challenges to present immigration confinement.").

Moreover, if this Court adopted the Government's interpretation of the statute, it would raise the necessary question of how far this unprescribed authority would stretch.   "It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings."  *Reno,* 525 U.S. at 487.   Yet the Government's interpretation of § 1252(g) creates an "interpretive anomaly" that would open the proverbial floodgates.  *See id.* at 478.   Thus, Section 1252(g) does not strip this Court of jurisdiction to hear Petitioner's challenge to his detention under § 1225.  *See, e.g.*, *Suri*, 2025 WL 1806692, at *7 (finding that "§ 1252(g) simply doesn't extend to habeas challenges to present immigration confinement"); *Sarmiento v. Perry*, o. 1:25-cv-01644-AJT-WBP, 2026 WL 131917, at *4 (E.D. Va. Jan. 19, 2026) ("Because [the] petition is a challenge to his present immigration confinement, the Court is not deprived of jurisdiction under Section 1252(g)"); *Portela-Hernandez v. Trump*, Civil No. 25-1633-BAH, 2026 WL 74042, at *4 (D. Md. Jan. 9, 2026) ("The jurisdictional bar the Government cites—§ 1252(g)—does not preclude this Court's review of a habeas petition brought under § 2241"); *S.D.B.B. v. Johnson*, No. 1:25-cv-882 , 2025 WL 2845170, at *3 (M.D.N.C. Oct. 7, 2025) ("Here, to the extent Petitioner challenges his detention and not the

13

pending hearing, his claims fall outside § 1252(g)'s scope."); *see also Castaneda v. Perry*, 95 F.4th 750 (4th Cir. 2024) (exercising jurisdiction over a habeas challenge to an immigrant's present confinement).

### 3. 8 U.S.C. § 1252(b)(9)

The Court of Appeals is the exclusive forum for "judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken . . . to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). As indicated by the plain language of this statute, this provision "applies only '[w]ith respect to review of an order of removal.'" *I.N.S. v. St. Cyr*, 533 U.S. 289, 313 (2001). Section 1252(b)(9) "does not present a jurisdictional bar" where petitioners "are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined." *Jennings v. Rodriguez*, 583 U.S. 281, 294–95 (2018) (plurality opinion).[8]

Here, the Government argues that § 1252(b)(9) strips this Court of jurisdiction. (ECF No. 15-1 at 10.) Specifically, the Government reasons that Petitioner's challenge to the basis upon

---

[8] The holding of a case in which there was no majority opinion "'may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 (1976)). In *Jennings*, the petitioner was an immigrant who had been granted lawful permanent resident status. 583 U.S. at 289. After he was convicted of a felony, the petitioner was detained under § 1226. *Id.* at 289–90. While his removal was being litigated, he filed a habeas petition in federal district court, alleging that he was entitled to a bond hearing to determine whether his continued detention was justified. *Id.* at 290. A litany of issues made their way to the Supreme Court. *See id.* at 291–92. However, the Supreme Court first addressed whether, *inter alia*, 8 U.S.C. § 1252(b)(9) stripped it of jurisdiction to hear the habeas petition based on the right to a bond hearing pending deportation. *Id.* "[A] majority of the Court" concluded it "ha[d] jurisdiction." *Id.* at 314 (Thomas, J., concurring). The three dissenting justices held that § 1252(b)(9) "applies only 'with respect to review of an order of removal under § 1252(a)(1).'" *Id.* at 355 (Breyer, J., dissenting) (quoting § 1252(b)). The three justices in the plurality took a narrower view. They did not purport to "provide a comprehensive interpretation" of § 1252(b)(9). *Id.* at 294 (plurality opinion). Instead, they held that because the respondents were not "asking for review of an order of removal," "challenging the decision to detain" them "in the first place or to seek removal," or "challenging any part of the process by which their removability will be determined," the jurisdiction strip did not apply. *Id.* Because the plurality view is a strict subset of the dissent's view, it is the narrower of the two and therefore controls here. *See Marks*, 430 U.S. at 193.

which he is detained is enough to trigger § 1252(b)(9) because "detention *is* an 'action taken . . . to remove' an alien." (*Id.* (citation omitted).) Besides attempting to expand the reach of § 1252(b)(9) beyond recognition, this argument is contrary to established Supreme Court precedent.

To start, Petitioner plainly does not challenge being detained or facing removal. (*Compare* ECF No. 1 at 4, ¶ 15 (acknowledging that Petitioner "is subject to civil immigration custody") *with* ECF No. 15-1 at 10.) Instead, he challenges the misapplication of § 1225 to his detention and the consequent denial of his right to seek bond under 8 U.S.C. § 1226. (*See* ECF No. 1 at 10–11.) Thus, Petitioner is not challenging the decision to detain him or seek his removal, any part of the process by which his removability will be determined, or an order of removal. *Jennings*, 583 U.S. at 294–95 (rejecting arguments for interpreting § 1252(b)(9) to mean that any action taken in furtherance of deporting an alien, including detention, would "aris[e] from . . . action[s] taken . . . to remove an alien from the United States" because such an "expansive interpretation" of § 1252(b)(9) "would lead to staggering results"). He is challenging his inability to receive a bond hearing, which is "separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding." 8 C.F.R. § 1003.19(d). Indeed, the question of whether Petitioner is being improperly held without bond under § 1225(b)(2) is identical to one of the claims brought in *Jennings* itself. *See* 583 U.S. at 290. Thus, despite the Government's creative distortion of the law, § 1252(b)(9) does not strip this Court of jurisdiction.

### 4. Exhaustion of Administrative Remedies

Where Congress "specifically mandates" exhaustion of administrative remedies, "exhaustion is required." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992). However, "where Congress has not clearly required exhaustion, sound judicial discretion governs." *Id.* As such,

exhaustion may be excused when "the legal question is 'fit' for resolution and delay means hardship . . . or when exhaustion would prove 'futile[.]'" *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 13 (2000) (citations omitted).   For example, exhaustion may prove futile when "an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it." *See id.* at 148.

Here, the Government alleges that Petitioner's claim is jurisdictionally barred because "Petitioner has not availed himself to the administrative remedies available to him, nor has he made any attempt to do so."  (ECF No. 15-1 at 13.)  Although § 2241 contains no express reference to exhaustion of state remedies, courts have held that exhaustion is necessary prior to filing a section 2241 petition in federal court.  *See, e.g.*, *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 490-91 (1973).   Thus, "because exhaustion requirements for filing pursuant to § 2241 are judicially imposed, this Court has discretion to waive exhaustion in certain circumstances and proceed to the merits of petitioner's claim."  *Myers v. Williams*, No. 2:15-cv-49, 2015 WL 9304550, at *4 (N.D. W. Va. Dec. 21, 2015).

The Court exercises that discretion because the administrative body that could provide relief to Petitioner has already predetermined the issue.  *See Shalala*, 529 U.S. at 13.   As discussed more fully below, the Board of Immigration Appeals ("BIA") has already determined that 8 U.S.C. § 1225(b)(2)(A) applies to detained illegal immigrants, like Petitioner, who "have been residing in the United States for years."  *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 220–21 (BIA 2025).   Consequently, any attempt by Petitioner to exhaust his administrative remedies would be futile, and exhaustion is excused.[9]  *See, e.g., See Maldonado v. Baker*, No. CV

---

[9] To be clear, neither 8 U.S.C. §§ 1225 nor 1226 contain a textual exhaustion requirement for immigrants in ICE custody.  *Compare with* 8 U.S.C. § 1252(d)(1) (providing that a "court may review a *final order of removal* only if .

25-3084-TDC, 2025 WL 2968042, at *4 (D. Md. Oct. 21, 2025); *Leal-Hernandez v. Noem,* No. 25-cv-02428-JRR, 2025 WL 2430025, at *10–12 (D. Md. Aug. 24, 2025); *Duarte Escobar v. Perry*, No. 3:25CV758, 2025 WL 3006742, at *5 (E.D. Va. Oct. 27, 2025); *accord Lopez-Campos v. Raycraft,* No. 25-cv-12486, 2025 WL 2496379, *4–5 (E.D. Mich. Aug. 29, 2025); *Chavez v Noem*, No. 25-cv-02325-CAB-SBC, 2025 WL 2730228, *3–4 (S.D. Cal. Sept. 24, 2025).

Therefore, all of the Government's jurisdictional arguments fail.

### 5. Suspension Clause

Even if the INA did purport to bar jurisdiction in this case, this Court would still have jurisdiction pursuant to the Suspension Clause. The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I § 9, cl. 2. "The Clause protects the rights of the detained by a means consistent with the essential design of the Constitution. It ensures that, except during periods of formal suspension, the Judiciary will have a time-tested device, the writ, to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." *Boumediene v. Bush*, 553 U.S. 723, 745 (2008).

Courts employ a two-step analysis to determine whether a jurisdiction-stripping statute violates the Suspension Clause. First, the Court must determine whether the petitioner is prohibited from invoking the Suspension Clause due to some attribute of the petitioner or to the circumstances surrounding his arrest or detention. *Id.* at 739. "[A]t least" three factors are relevant to this first inquiry: "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where

---

. . the alien has exhausted all administrative remedies available" to him (emphasis added)).

apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the [detainee's] entitlement to the writ." *Id.* at 766; *see also Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103, (2020). Second, the Court asks whether there is an "adequate and effective" substitute for habeas to "test the legality of the [Petitioner]'s detention (or removal)." *Boumediene*, 553 U.S. at 766.

Here, the Suspension Clause applies. To start, all three factors weigh in Petitioner's favor. First, it is undisputed that Petitioner is not a United States citizen, but the Government claims that Petitioner is "seeking admission" into the United States. However, the "process" through which that status was determined was far from adequate. ICE's determination that Petitioner is in the country illegally and "seeking admission," which was made on the side of the highway before Petitioner was indefinitely detained without a hearing, provided Petitioner no due process, discussed more fully below. *Cf. Boumediene*, 553 U.S. at 767 (concluding that the process in which the Combatant Status Review Tribunal's determination that petitioners were enemy combatants, which did not permit the petitioners to retain counsel, introduce evidence on their own behalf, or cross-examine the prosecution's witnesses "f[e]ll well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review").

Further, despite the fact that Petitioner is not an American citizen, he was *legally paroled* into the Country. Once here, he has worked and paid taxes in the United States for years. He has also established a family and significant ties to the community. These contacts indicate that Petitioner is "part of a national community or [has] otherwise developed sufficient connection with this country to be considered part of that community.'" *See Joshua M. v. Barr*, 439 F. Supp. 3d 632, 672 (E.D. Va. 2020) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

18

As to the second factor, Petitioner was re-detained within a sovereign territory of the United States, which weighs in favor of finding that the Suspension Clause applies. *Cf. Boumediene*, 553 U.S. at 768 (apprehension and detention occurred outside the sovereign territory of the United States). As to the third factor, there are no practical obstacles in permitting this proceeding, other than the kind of "incremental expenditure of resources" that the Supreme Court deemed an insufficient barrier to granting a writ of habeas corpus. *Id.* at 769 (comparing "[c]ompliance with any judicial process" which always "requires some incremental expenditure of resources" with judicial concerns in a post-war occupation like "enemy elements, guerilla fighters, and 'werewolves'") Finally, turning to the second *Boumediene* inquiry, adequate alternatives to a habeas petition do not exist because it is the government's position that Petitioner is not entitled to any hearing before a neutral decisionmaker on the matter, as discussed more fully below.

Thus, the Court still has jurisdiction pursuant to the Suspension Clause. *See, e.g.*, *Y-Z-L-H v. Bostock*, 792 F.Supp.3d 1123, 1142–43 (D. Or. 2025); *Munoz Materano v. Arteta*, No. 25 CIV. 6137, 2025 WL 2630826, at *10, n. 17 (S.D.N.Y. Sept. 12, 2025); *Boutta v. Raycraft*, No. 1:25-CV-1559, 2025 WL 3628232, at *8 (W.D. Mich. Dec. 15, 2025); *see also Kong v. United States*, 62 F.4th 608, 616 (1st Cir. 2023) (explaining that the Government's suggested interpretation could bar the courts from hearing all detention-related claims, which "would raise serious constitutional concerns under the Suspension Clause. Absent the right to judicial review through a habeas petition, the government could detain noncitizens indefinitely without needing to provide a justification to anyone").

Accordingly, the Government's Motion to Dismiss, (ECF No. 15-1), is **DENIED** insofar as it argues that this Court lacks jurisdiction.

### B.  The INA

The Court now turns to the central dispute: whether Petitioner falls under § 1225(b)(2)(A)'s mandatory detention provision or § 1226(a)'s discretionary detention provision.   Section 1225(a) provides that "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."   8 U.S.C. § 1225(a)(1).   Section 1225 then divides "applicants for admission" into two categories under § 1225(b)(1) and § 1225(b)(2).   For purposes of this case, Section 1225(b)(2) is the relevant provision warranting discussion.[10]

Section 1225(b)(2)(A) mandates detention when "an alien who is an applicant for admission" is "seeking admission" and an immigration officer determines that they are "not clearly and beyond a doubt entitled to be admitted."  8 U.S.C. § 1225(b)(2)(A).  Such detention is mandatory except "for urgent humanitarian reasons or significant public benefit[.]"  8 U.S.C. § 1182(d)(5)(A); *see also* 8 C.F.R. § 212.5(b) (authorizing humanitarian parole provided the noncitizens "present neither a security risk nor a risk of absconding").   Noncitizens detained under Section 1225(b) "are not entitled to a bond hearing[.]"   *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 484 (S.D.N.Y. 2025) (citing to *Jennings*, 583 U.S. at 297 ("[N]either § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings.")

In contrast, Section 1226 governs a separate non-mandatory detention scheme and provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending

---

[10] Section 1225(b)(1) applies to noncitizens "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation," *Jennings* 583 U.S. 281 at 287 (citing § 1225(b)(1)(A)(i)), and other noncitizens who receive special designation by the Attorney General.  *Id*. (citing § 1225(b)(1)(A)(iii)).   Section 1225(b)(2) is a "catchall provision" that applies to all other applicants.  *Id*.   Neither party contends that Section 1225(b)(1) applies to Petitioner.   Rather, the Government maintains that Petitioner is an applicant for admission specifically under Section 1225(b)(2)(A).   (*See* ECF No. 15-1 at 20.)

20

a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).

While that decision is pending, the Attorney General may "continue to detain the arrested alien,"

"release the alien on bond of at least $1,500," or "release the alien on conditional parole."  8

U.S.C. § 1226(a)(1)–(2).   Section 1226 is considered the "default rule" for detaining and

removing aliens "already present in the United States."  *Jennings*, 583 U.S. at 303.   The arresting

immigration officer makes an initial custody determination, but noncitizens have the right to

request a custody redetermination (i.e., bond) hearing before an Immigration Judge.  *See* 8 C.F.R.

§§ 1236.1(c)(8), (d)(1).   In addition to bond, the government may release a noncitizen detained

under Section 1226(a) on an Order of Recognizance, which is a form of conditional parole.  *See*

8 U.S.C. § 1226(a)(2)(B); *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115 (9th Cir. 2007) ("It

is apparent that the [government] used the phrase 'release on recognizance' as another name for

'conditional parole' under § 1226(a)."); *Hasan v. Crawford*, 800 F.Supp.3d 641, 655 (E.D. Va.

Sept. 19, 2025) (discussing the distinction between conditional parole—i.e., release on

recognizance pursuant to 8 U.S.C. § 1226—and "humanitarian parole" pursuant to 8 U.S.C. §

1182(d)(5)(A)—and citing accordant authorities).

Based on the plain text of the statutes, there is no dispute that Petitioner is entitled to a

bond hearing before an Immigration Judge pursuant Section 1226(a).   However, recent changes

in policy by DHS and a decision of the BIA has resulted in the mandatory detention of aliens who

entered the United States without inspection, regardless of where they were apprehended or how

long they have been physically present in the United States.   Specifically, on July 8, 2025, DHS

instituted a notice titled "Interim Guidance Regarding Detention Authority for Applicants for

Admission" ("the Notice") to all ICE Employees.   *See* ICE Memo: Interim Guidance Regarding

Detention Authority for Applications for Admission, AILA Doc. No. 25071607 (July 8, 2025),

available at https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-

authority-for-applications-for-admission.   The Notice indicated that DHS, in coordination with

the Department of Justice ("DOJ"), "revisited its legal position" on the INA and determined that

8 U.S.C. § 1225(b)(2), rather than 8 U.S.C § 1226, is the applicable immigration authority for any

alien present in the United States "who has not been admitted . . . whether or not at a designated

port of arrival."   *Id.*   Accordingly, "it is the position of DHS that such aliens are subject to

[mandatory] detention under INA § 235(b) [§ 1225(b)] and may not be released from ICE custody

except by INA § 212(d)(5) parole."   *Id.*   The Notice further provides:

> These aliens are also ineligible for a custody redetermination hearing (bond
> hearing) before an immigration judge and may not be released for the duration of
> their removal proceedings absent a parole by DHS. For custody purposes, these
> aliens are now treated in the same manner that "arriving aliens" have historically
> been treated.

*Id.*

Then, On September 5, 2025, the BIA issued a precedential decision adopting this new

interpretation of the government's detention authority under the INA.   *See Hurtado*, 29 I. & N.

Dec. 216.   Pursuant to the BIA's decision in *Hurtado*, nearly all noncitizens who entered the

United States without inspection are now subject to mandatory detention pursuant to 8 U.S.C. §

1225(b)(2), rather than the discretionary detention provisions of 8 U.S.C. § 1226(a).   *Id.* at 227–

29.   In fact, Immigration Judges no longer have authority to hear bond requests or grant bond to

noncitizens present in the U.S. who entered without inspection.   *Id.*

The implications of DHS's policy change cannot be understated: "[i]t has been estimated

that this novel interpretation [of the INA] would require the detention of millions of immigrants

currently residing in the United States."   *Martinez v. Hyde*, 792 F.Supp.3d 211, 218 (D.Mass.

2025). It comes as no surprise, then, that the reasoning in *Hurtado* has been repeatedly rejected by the overwhelming majority of district courts that have opined on it. *See, e.g.*, *Bethancourt Soto v. Soto*, --- F.Supp.3d ----, No. 25-cv-16200, 2025 WL 2976572, at *7 (D.N.J. Oct. 22, 2025) (collecting cases); *Rodriguez v. Bostock*, No. 3:25-CV-05240-TMC, ——— F.Supp.3d ———, 2025 WL 2782499 (W.D. Wash. Sept. 30, 2025) ("Every district court to address this question has concluded that the government's position belies the statutory text of the INA, canons of statutory interpretation, legislative history, and longstanding agency practice.") (collecting cases)); *see also Barco Mercado v. Francis*, --- F.Supp.3d ----, 2025 WL 3295903, at *4 (S.D.N.Y. Nov. 26, 2025) (finding that challenges to DHS's new interpretation of the mandatory detention scheme have prevailed in 350 out of 362 cases "decided by over 160 different judges sitting in about fifty different courts spread across the United States"). Nevertheless, Chief Immigration Judge Teresa L. Riley has instructed Immigration Judges that "*Hurtado* remains binding precedent on agency adjudicators." *See Singh v. Raycraft*, No. 25-CV-14051, 2026 WL 243205, at *5 (E.D. Mich. Jan. 29, 2026) (internal citation omitted).

Here, this Court joins the vast majority of courts confronting this precise issue that have rejected the Government's interpretation. As discussed below, Section 1226(a) clearly applies to Petitioner. The Government's arguments—which contradict the plain text of the statutes, Supreme Court precedent, and common sense—are without merit.

### 1. The Plain Text of the Discretionary Detention Provision of 8 U.S.C. § 1226 Governs Petitioner's Detention

According to the Government, Petitioner is an "alien present without admission[,]" meaning he is statutorily defined as an "applicant for admission" under § 1225(b)(2)(A). (ECF No. 15-1 at 20.) This interpretation contravenes the plain meaning of § 1225(b)(2)(A).

23

As set forth above, Section 1225(b)(2)(A) provides for the detention "of an alien who is an *applicant for admission*, if the examining immigration officer determines that *an alien seeking admission* is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). Thus, for § 1225(b)(2)(A)'s mandatory detention proceedings to apply, the noncitizen must be: (1) an applicant for admission, (2) who is "seeking admission" to the country, and (3) whom an examining immigration officer determines "is not clearly and beyond a doubt entitled to be admitted." *Martinez*, 792 F.Supp.3d at 214 (quoting § 1225(b)(2)(A)).

Here, Section 1225(b)(2)(A) is inapplicable because the second requirement is not met. To be sure, Petitioner is likely an "applicant for admission" under the first requirement of the statute. Section 1225(a)(1) defines an "applicant for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States[.]" 8 U.S.C. § 1225(a)(1). The terms "admission" and "admitted" mean "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Because Petitioner is present in the United States and has not been admitted, he may be deemed an "applicant for admission," satisfying the first criteria of § 1225(b)(2)(A).

However, even if Petitioner qualifies as "an applicant for admission" under Section 1225(a)(1), that status alone does not trigger mandatory detention under § 1225(b)(2)(A). Section 1225(b)(2)(A) imposes detention only where the noncitizen is also "seeking admission." *See* 8 U.S.C. § 1225(b)(2)(A); *see also Lopez-Campos* 797 F. Supp. 3d at 781. Accordingly, whether mandatory detention applies turns on the meaning of the phrase "seeking admission."

As already explained, "admission" refers to "the lawful entry of the alien into the United States after inspection and authorization by the immigration officer." 8 U.S.C. § 1101(a)(13)(A).

The word "entry," is not defined in the INA, however, it has long been understood to mean "a crossing into the territorial limits of the United States." *Hing Sum v. Holder*, 602 F.3d 1092, 1100–01 (9th Cir. 2010) (quoting *Matter of Pierre*, 14 I&N Dec. 467, 468 (BIA 1973)). Similarly, the dictionary definition of "entry" is "the right or privilege of entering" or "the act of entering[.]" Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/entry (last visited Jan. 30, 2026). The phrase "seeking admission" is also undefined by statute. The dictionary definition of "seeking" is "ask[ing] for," or "go[ing] in search of[.]" Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/seeking (last visited Jan. 30, 2026). Accordingly, the term "seeking" "'necessarily implies some sort of present-tense action.'" *Duarte Escobar*, 2025 WL 3006742, at *9 (quoting *Martinez*, 792 F. Supp. 3d at 218).

Thus, when read together, the use of the verb "seeking" in § 1225(b)(2)(A) "denotes an active and present effort," such that "'an alien seeking admission' is a noncitizen who, at the time of his arrest, is actively and presently pursuing inspection and authorization by an immigration officer to lawfully enter the United States." *Valverde v. Olson*, No. 25-CV-1502, 2025 WL 3022700, at *3–4 (E.D. Wis. Oct. 29, 2025); *see also Hyppolite v. Noem*, 2025 WL 2829511, at *9 (E.D.N.Y. Oct. 6, 2025) (Under a straightforward reading of the statute, "seeking admission is meant to refer to those who are presenting themselves at the border, or who were recently apprehended just after entering.")

In response, the Government makes no attempt to address the definitions of the terms within § 1225(b)(2)(A). Instead, it superficially argues that "applicants for admission" are indistinguishable from aliens "seeking admission[,]" and thus § 1225(b)(2) applies to *all* applicants for admission. (ECF No. 15-1 at 20.) Relying on *Hurtado*, the Government's view is that an

alien actively seeks admission merely by being present in the United States without having been lawfully admitted.   (*See id*.)   This argument fails because the plain text of Section 1225(b)(2)(A) clearly demonstrates that an alien "seeking admission" must do more than simply exist within the United States.

To that extent, there is no evidence that Petitioner was actively seeking admission into the United States.   To the contrary, the record indicates that Petitioner entered the United States in 2022, works as a contractor, pays taxes, and resides in the United States with his wife and child. (ECF No. 1 at 4.)   After all, how can a person who has already entered the United States be actively "seeking" to enter it?   Under any ordinary understanding of the English language, the Government's interpretation of § 1225 is wrong.

### 2.   The Government's Interpretation of 8 U.S.C. § 1225 Would Render Other Statutory Provisions Superfluous

Under "one of the most basic interpretive canons . . . [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citation modified).   "This principle . . . applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010).

Here, the Government argues that Section 1225(b)(2)(a) should apply to all applicants for admission, including those already living in the United States.   (*See* ECF No. 15-1 at 23.)   Yet, Petitioner reasons that if § 1225(b) applied to all "applicant[s] for admission," then there was no need for Congress to limit the statute's application to "alien[s] seeking admission."   (*See* ECF No. 18-1 at 11.)   In fact, the Government is essentially asking the Court to strike the term "seeking admission" from the INA.   (*Id.*)   The Court agrees with Petitioner.   *See also, e.g.*, *Lopez Benitez*,

26

795 F.Supp.3d at 488; *Martinez*, 792 F.Supp.3d at 218 (collecting cases).

Further, if the Government's interpretation were correct, it would render superfluous provisions of Section 1226 and essentially remove it from existence. *See e.g., Alvarez Ortiz v. Freden*, No. 25-CV-960-LJV, 2025 WL 3085032, at *7 (W.D.N.Y. Nov. 4, 2025) ("As numerous courts have observed, if all 'applicant[s] for admission' also are 'seeking admission,' then the words 'seeking admission' would be surplusage" (collecting cases)). After all, if Congress did not intend to distinguish between an "applicant for admission" and those "applicant[s] for admission" who are "seeking admission," it simply could have omitted the "seeking admission" language. But it did not. Treating the terms as synonymous would thus violate the principle that Congress is presumed to have acted intentionally in choosing different words in a statute, such that different words and phrases should be accorded with different meanings. *Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) (describing the "meaningful-variation canon" as "the principle that where a statutory scheme has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea").

Instead, there must be an appreciable or meaningful distinction between Sections 1225 and 1226. In fact, the Supreme Court has already differentiated these two sections, distinguishing their application by the category of noncitizens to which their provisions apply. *See Jennings* 583 U.S. at 289 (holding that the Government may "detain certain [noncitizens] seeking admission into the country" under Section 1225(b) while § 1226 "authorizes the Government to detain certain [noncitizens] *already in the country* pending the outcome of removal proceedings" (emphasis added)).

27

The Government attempts to downplay the consequences of its proposed position, stating that its interpretation of Section 1225(b)(2)(A) does not negate Section 1226(a) in its entirety, but only negates its application in situations which Section 1225(b)(2)(A) covers.  (ECF No 15-1 at 21.)  That contention fails, as there would be no categories of aliens left whom § 1226(a)'s discretionary detention authority could apply.  *See Bautista v. Santacruz*, No. 5:25-CV-01873-SSS-BFM, 2025 WL 3713987 at *11 (C.D. Cal. Dec. 18, 2025) (finding that respondents' proposed interpretation requiring that any and all inadmissible noncitizens are also "applicants for admission" cannot be harmonized with other portions of the INA.)

Likewise, the Government's interpretation would nullify additional provisions in Section 1226.  Section 1226 generally implements a discretionary scheme for non-citizen detention but carves out certain disfavored noncitizens whom the Government is required to detain.  *See* 8 U.S.C. § 1226(a); *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010) (holding that, where "Congress has created specific exceptions" to the applicability of a statute or rule, it "proves" that the statute or rule generally applies absent those exceptions)).  One such carve-out, recently enacted by the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025), mandates detention for non-citizens who meet certain criminal and inadmissibility criteria.  *See* 8 U.S.C. § 1226(c)(1)(E).  However, if, as asserted by the Government, a noncitizen's inadmissibility were alone already sufficient to mandate detention under Section 1225(b)(2)(A), then the 2025 amendment would have no effect.  *See, e.g., Maldonado*, 2025 WL 2374411, at *12 (same); *Hasan*, 2025 WL 2682255, at *8 (same).

The Government attempts to justify its position by asserting that the mandatory detention provisions in Section 1226 reflect a "'congressional effort to be doubly sure' that certain aliens are

28

detained." (ECF No. 15-1 at 22–23.) This cannot be squared with Congress's deliberate amendment to the statute. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995). "[T]he canon against surplusage is strongest when an interpretation," such as this one, "would render superfluous another part of the same statutory scheme." *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

### 3. The Government Previously Determined that the Discretionary Detention Provision of 8 U.S.C. § 1226 Governs Petitioner's Detention

Despite the Government's claim that "[t]o interpret 8 U.S.C. § 1225(b)(2)(A) as not applying to all applicants for admission would render it meaningless[,]" (ECF No. 15-1 at 23), the opposite is true. This is evidenced by the inconsistent treatment of Petitioner under identical factual circumstances. Petitioner was previously classified and detained under Section 1226. (*See* ECF No. 15-2 at 6.) Yet, without any change in the relevant facts surrounding his presence in the United States, the Government alleges he now somehow falls exclusively under Section 1225(b)(2)(A). (*See* ECF No. 15-1 at 20.)

The Government's own exhibits unequivocally establish that Petitioner was previously detained pursuant to the Government's discretionary authority under Section 1226(a). (ECF No. 15-7 at 2.) Petitioner was arrested and detained in 2022, and the warrant for his arrest was explicitly authorized under "section 236 of the Immigration and Nationality Act"—*i.e.*, Section 1226. (ECF No. 15-7 at 2.) In fact, Petitioner's 2022 Notice of Custody Determination explicitly states that Border Patrol released him on his own recognizance also pursuant to Section 236 of the INA, codified at § 1226. (ECF No. 15-2 at 6.)

Such a release on recognizance is not a "humanitarian" or "public benefit" "parole into the

United States" under the exceptions to mandatory detention, *see* 8 U.S.C. § 1182(d)(5)(A), but rather falls squarely under the type of "conditional parole" from detention authorized under Section 1226. *See Martinez*, 792 F. Supp. 3d 211 at 215 (explaining that petitioner's release on her own recognizance "does not indicate that she was examined or detained under section 1225 but instead explicitly premises her release on section 1226 ('[i]n accordance with section 236 of the Immigration and Nationality Act')"); *see Lopez Benitez* 795 F. Supp. 3d at 485 (finding that a noncitizen detained pursuant to Section 1226 cannot be recharacterized as falling under Section 1225); *Ortega-Cervantes*, 501 F.3d at 1115–16 (holding that a noncitizen released on an "Order of Release on Recognizance" necessarily must have been detained and released under section 1226 because he was not an "arriving alien" under the regulations governing section 1225 examinations).

Thus, the Government previously treated Petitioner as subject to Section 1226(a). That determination, made by Border Patrol at the Laredo Sector Enhanced Centralized Processing Center after a full screening, is more credible than the quick and inaccurate determination that ICE made on the side of Interstate-77. Further, the Government did not produce any evidence indicating that facts regarding his presence in the United States have changed since his initial detention in 2022. In doing so, the Government fails to reconcile the disparate classification of Petitioner under Section 1226(a) with its current position that he now falls under Section 1225(b)(2)(A). Petitioner has already undergone a custody determination pursuant to Section 1226(a) and was released into the United States.[11] Therefore, he cannot plausibly be deemed to

---

[11] At the Show Cause Hearing, Petitioner suggested that the Government is estopped from changing its determination of the detention authority based on his reliance interests. (*See* ECF No. 22.) However, given its holdings below, the Court declines to reach this issue of estoppel.

still be seeking admission.

At bottom, the Government's concessions in its exhibits regarding Petitioner's arrest, release, and subsequent re-arrest are by themselves a sufficient basis to conclude that he was detained pursuant to Section 1226. But even without those concessions, a proper reading of Section 1225(b) compels the conclusion that the Government's interpretation lacks a sufficient legal basis on other significant grounds, as discussed above.

Accordingly, Petitioner's detention is governed by § 1226(a), and the Government's Motion to Dismiss, (ECF No. 15-1), is **DENIED** to the extent it argues otherwise.

### C. *Due Process*

The Fifth Amendment states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has repeatedly affirmed that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("We have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty."). "The procedural component of due process 'imposes constraints on governmental decisions which deprive individuals of 'liberty' . . . within the meaning of the Due Process Clause.'" *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). For this reason, "civil commitment for *any purpose* constitutes a significant deprivation of liberty that requires due process protections." *Addington v. Texas*, 441 U.S. 418, 425 (1979) (emphasis added).

31

Thus, "when the government deprives a person of a protected liberty . . ., it is obliged to provide 'notice and opportunity for hearing appropriate to the nature of the case.'"  *Cardall*, 826 F.3d at 741 (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).    The question of what form of "notice and opportunity for hearing" is "appropriate" and thus constitutionally required in a given case requires considering three factors.  *Id.* at 742 (citing *Turner v. Rogers*, 564 U.S. 431, 444–45 (2011)).    Specifically, the Supreme Court has instructed courts to consider the following:  (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335. "The three-factor *Mathews* framework is 'flexible' and highly 'fact-specific.'"  *Cardall*, 826 F.3d at 743 (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 319 (2nd Cir. 2002)).    "The mere availability and utilization of some procedures does not mean they [a]re constitutionally sufficient. That is, the Fifth Amendment guarantees 'due process of law,' not just 'some process of law.'"  *Id.* (citing *Davidson v. City of New Orleans*, 96 U.S. 97, 107 (1877) (Bradley, J., concurring)).

Here, Petitioner is entitled to a bond hearing pursuant to § 1226(a), as discussed above. Yet, after ICE arrested Petitioner, he was held in a state jail for *three days* before he received notice of a hearing to determine whether removal proceedings would begin.   That hearing was scheduled for January 29, 2026—almost *three weeks* after he had been detained.   Such a delay is a violation of Petitioner's due process rights.   *Larrazabal-Gonzalez*, 2026 WL 221706, at *5 ("This detention-first and hearing-sometime-later practice finds no support in the Constitution.").

The *Mathews* factors support this finding.   Petitioner asserts that all three *Mathews* factors weigh in his favor.   (ECF No. 1 at 9–10, ¶¶ 42–45.)   The Government's response does not so much as mention these factors, let alone address them.   (*See generally* ECF No. 15-1.)   Instead, the Government seems to suggest that Petitioner has no due process rights.   (*See id.* at 23–26.)   As discussed below, the Government's position on basic Constitutional protections is plainly wrong, and an application of the *Mathews* factors supports a finding that Petitioner's civil detention violates his procedural due process rights.   Each topic is discussed in turn below.

    1.  Due Process Rights

The Government asserts that the "Constitution does not mandate more process to Petitioner than the INA."[12]   (ECF No. 15-1 at 23–25.)   In fact, the Government claims that "Congress' intent to deport aliens must take precedence" over Petitioner's due process rights.   (*Id.* at 25–26.)

The Constitution plainly says otherwise.

The Fifth Amendment of the Constitution promises freedom and protection to *all* persons in the United States.   U.S. Const. amend. V ("*No person* shall be . . . deprived of life, liberty, or property, without due process of law" (emphasis added)).   As such, "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."   *Zadvydas*, 533 U.S. at 693 (2001); *see also Pyler v. Doe*, 457 U.S. 202, 210 (1982) ("Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government.").

---

[12]  Similarly, at the Show Cause Hearing, the Government stated that the Petitioner only has "some type of due process [right]" without further explanation.

Thus, the Government's argument contradicts the plain language of the Constitution and "*well established*" Supreme Court precedent "that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." *Trump,* 604 U.S. at 673 (internal quotations and citations omitted) (emphasis added); *Reno v. Flores*, 507 U.S. 292, 307 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

In doing so, the Government relies on two Supreme Court cases and three decisions out of the Eastern District of Virginia, (*but see* ECF No. 15-1 at 24 (inexplicably claiming that "[o]ther jurists of this Court have come to similar conclusions")), that absolutely do not undermine this very basic understanding of Constitutional rights.   As Petitioner notes, *Thuraissigiam*, 591 U.S. at 140, "only addressed the due process afforded to arriving aliens detained pursuant 8 U.S.C. § 1225(b)(1)," (ECF No. 18-1 at 12; *see also* ECF No. 15-1 at 24 (conceding the same)), and does *not* apply to individuals who are already within the United States, *see Zadvydas*, 533 U.S. at 693 (explaining that aliens within the United States have Fifth Amendment due process protections "whether their presence here is lawful, unlawful, temporary, or permanent").   Similarly, Petitioner correctly notes, (ECF No. 18-1 at 12), that *Jennings* explicitly declined to address the petitioners' constitutional arguments on their merits.   *See* 583 U.S. at 312 (reasoning that the Ninth Circuit had not yet considered the issue).   Finally, the Eastern District of Virginia cases all involved individuals who were paroled into the United States pursuant to 8 U.S.C. § 1182(d)(5)(A), which as discussed above, is distinct from being paroled pursuant to 8 U.S.C. § 1226(a).   *See Pipa-Aquise v. Bondi*, No. 1:25-cv-01094-MSN-WBP, 2025 WL 2490657 (E.D. Va. Aug. 5, 2025); *Olaya Rodriguez v. Bondi*, No. 1:25-cv00791-AJT-WBP, 2025 WL 2490670 (E.D. Va. June 24,

2025); *Aslanturk v. Hott*, 459 F.Supp.3d 681, 693 (E.D. Va. 2020).   In any event, this Court is not bound by any of those Eastern District of Virginia decisions.   *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (explaining that a decision of a federal district court judge is not binding precedent in a different judicial district).

The Government's desire to deport aliens trumps neither the plain text of the Constitution nor Supreme Court precedent.   *See also Mercado*, --- F.Supp.3d ----, 2025 WL 3295903, at *13 ("No executive edict is free to override [the Constitution and the laws enacted by Congress].").   The Government argues that "[a] rule that treated an alien who enters the country illegally, such as Petitioner, more favorably than an alien detained after arriving at a [point of entry] would 'create a perverse incentive to enter at an unlawful rather than a lawful location,'" and "[s]uch a rule reflects 'the precise situation that Congress intended to do away with by enacting' the [Illegal Immigration Reform and Immigrant Responsibility Act of 1996]."   (*Id.* (quoting *United States v. Gambino-Ruiz*, 91 F.4th 981, 990 (9th Cir. 2024).   If that is the case, then Congress should amend Section 1226 to reflect that intent.   *See Lamie*, 540 U.S. at 542.   After all, it is beyond the federal courts' "province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result."   *United States v. Granderson*, 511 U.S. 39, 68 (1994) (concurring opinion).   Unless that occurs, this Court is bound to the well-established Supreme Court precedent that immigrants within the United States are entitled to the full gambit of Fifth Amendment Due Process protections.

As this Court has recently made clear, "[d]espite what some may have been led to believe, immigrants illegally in this country enjoy protections guaranteed by the Fifth Amendment." *Larrazabal-Gonzalez*, 2026 WL 221706, at *5.   It is unfathomable how the Government can argue

otherwise in blatant contradiction of the plain language of the Constitution and clear and extensive Supreme Court precedent. Thus, to the extent that the Government argues that Petitioner is not protected by the Fifth Amendment Due Process Clause, its Motion to Dismiss is **DENIED**.

2. The *Mathews* Factors

As discussed above, Petitioner argued that the *Mathews* factors weigh in his favor, and the Government utterly failed to respond. Even if the Government had attempted to defend itself, the *Mathews* factors all weigh against it. Each factor is discussed in turn below.

i. *Private Interest*

The first factor requires consideration of the private interests affected by Petitioner's confinement. The interest in freedom from physical detention is "the most elemental of liberty interests." *Hamdi*, 542 U.S. at 529 (directing courts, when assessing the first factor, to consider only the petitioner's interests at stake in ongoing detention without consideration of the respondents' justifications for the detention (quotation omitted)); *Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."); *see also Larrazabal-Gonzalez*, 2026 WL 221706, at *1 ("Liberty . . . is the baseline."). Thus, the first *Mathews* factor weighs heavily in Petitioner's favor.

ii. *Risk of Erroneous Deprivation*

As to the second *Mathews* factor, the procedures currently employed by the Government present a serious risk of erroneous deprivations of Petitioner's liberty. As discussed above, Section 1226 governs Petitioner's detention, and he is entitled to a bond hearing. However, Petitioner has been denied a bond hearing, as he is presently and erroneously being detained under

36

the mandatory detention provisions of § 1225.   Thus, this factor also weighs heavily in Petitioner's favor.

### iii.   The Government's Interests

In evaluating the third *Mathews* factor, the Court must balance the Petitioner's interest and the risk of erroneous deprivation with "the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right," the additional procedural safeguards requested.   *Mathews*, 424 U.S. at 347. "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost."   *Id.* at 348.   To that extent, the third *Mathews* factor weighs in Petitioner's favor because there is not even the slightest inkling that the Government would face any form of undue burden by following the law in its efforts to enforce the INA.

To be sure, "Congress has repeatedly shown that it considers immigration enforcement— even against otherwise non-criminal aliens—to be a vital public interest."   *Miranda v. Garland*, 34 F.4th 338, 364 (4th Cir. 2022).   More specifically, the Supreme Court has recognized that the Government's interests in detaining noncitizens are typically "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community."   *See, e.g., Zadvydas*, 533 U.S. at 690.   After all, that is the inverse of the standard for releasing immigrants on bond. *See* 8 C.F.R. §§ 236.1(c)(8) (requiring an alien to demonstrate "that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding").

However, these interests would not be burdened by the individualized determination of an immigration judge as to whether Petitioner should be released on bond under section 1226(a).   To

start, providing Petitioner a bond hearing does not even ensure he will be released on bond.   It is left to the discretion of the immigration judge whether to release an immigrant on bond, and, even if Petitioner were released, the Government can have that release decision reviewed under the existing regulations.   *See* 8 C.F.R. §§ 1236.1(d)(1), (3); *accord Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 883 (C.D. Cal. 2025), *appeal dismissed sub nom. Perdomo v. Noem*, No. 25-4312, 2025 WL 4053187 (9th Cir. Nov. 21, 2025) ("Defendants make no showing that immigration enforcement cannot be conducted without undermining the rights afforded to immigrants under the Fifth Amendment."); *accord Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996) (reasoning that requiring law enforcement to comply with the Constitution does not prevent law enforcement from enforcing the law).

Further, it is not apparent how Petitioner's potential release could burden those interests. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.").   After all, Petitioner, who has no criminal history or gang affiliations, poses no apparent danger to the community.   *See id.*   The Government has not even argued otherwise. Likewise, because he never missed a hearing for his previous deportation proceeding, bond does not appear to be necessary to ensure his appearance at future proceedings.   *See id.*; *accord Hernandez-Lara v. Lyons*, 10 F.4th 19, 32 (1st Cir. 2021) ("The government fails to explain why its proffered interest in securing appearance at removal proceedings and for deportation holds sway where a noncitizen is not a flight risk."); *see also* Ingrid Eagly et. al., *Detaining Families: A Study of Asylum Adjudication in Family Detention*, 106 Cal. L. Rev. 785, 848 (2018) (finding that during the period 2001 to 2016, "86% of family detainees attended all their court hearings" after release

from detention, and among those seeking asylum, "96% attend[ed] all their hearings"). Thus, there is no apparent governmental interest favoring Petitioner's continued detention without a bond hearing. *See Chogllo Chafla v. Scott*, No. 2:25-CV-00437-SDN, 2025 WL 2688541, at *11 (D. Me. Sept. 21, 2025) (identifying the only governmental interest in favor of immigration habeas petitioners' continued detention without a bond hearing as an "across-the-board application of an inapplicable statute"); *Quijada Cordoba v. Knight*, No. 1:25-CV-00605-BLW, 2025 WL 3228945, at *8 (D. Idaho Nov. 19, 2025) (claiming that the only governmental interest in favor of immigration habeas petitioner's continued detention without a bond hearing "is to fulfill an arrest quota of 3,000 immigration arrests per day set by the current administration"); *but see Hasan*, 800 F. Supp. 3d at 661 ("[T]here is an extremely compelling public interest in protecting the fundamental principles of due process.").

In any event, any *de minimis* interest the Government may have in detaining Petitioner without a bond hearing is easily outweighed by the administrative burden and other societal costs associated with its current application of § 1225. *Cf. Mathews*, 424 U.S. at 347 (inquiring about administrative burdens and costs associated with providing additional procedural safeguards). "Limiting the use of detention to only those noncitizens who are dangerous or a flight risk may save the government, and therefore the public, from expending substantial resources on needless detention." *Hernandez-Lara*, 10 F.4th at 33; *see also Cordoba*, 2025 WL 3228945, at *8 (noting that detaining the petitioner "imposes additional fiscal and administrative burdens").

The Department of Justice recently reported that, in 2019, the "average cost of detaining noncitizens was $88.19 per prisoner per day," but "[o]ther estimates have placed the cost as high as $134 per day." *Black v. Decker*, 103 F.4th 133, 154 (2d Cir. 2024) (internal citations omitted).

That adds up quickly, considering it has been reported that ICE arrested and detained resulting in 650 individuals in West Virginia in the short span of approximately two weeks in January 2026. Press Release, United States Attorney's Office for the Southern District of West Virginia, U.S. Attorney Moore Capito Announces Success of Major Immigration Operation in West Virginia (Jan. 30, 2026), available at https://www.justice.gov/usao-sdwv/pr/us-attorney-moore-capito-announces-success-major-immigration-operation-west-virginia.   At a conservative estimate, that amounts to **$57, 323.50 per day** just for those 650 individuals arrested in early January.   Further, "[p]erhaps more importantly, such unnecessary detention imposes substantial societal costs," as it "separates families and removes from the community breadwinners, caregivers, parents, siblings and employees."   *Hernandez-Lara*, 10 F.4th at 33 (citing, in part, *Velasco Lopez v. Decker*, 978 F.3d 842, 855 (2d Cir. 2020)).

"[I]t is unconstitutional for the Government to detain a person without explanation, without a hearing, without notice, or without any means of challenging that detention," which is "exactly what the Government did" here.   *See Larrazabal-Gonzalez*, 2026 WL 221706, at *4. Application of the *Mathews* factors supports this finding.   *See generally id.*; *accord Duarte Escobar*, 2025 WL 3006742, at *15 (holding that an immigrant's continued detention without a bond hearing violates his Fifth Amendment due process rights); *Cordoba*, 2025 WL 3228945, at *8 (same); *Bethancourt Soto*, 2025 WL 2976572, at *8 (same); *see also Mercado*, --- F.Supp.3d ---, 2025 WL 3295903, at *4.

Accordingly, Petitioner has met his burden of proving that he is being held contrary to law by a preponderance of the evidence.[13]   *Walker*, 312 U.S. at 286.

---

[13] Because the Court has found that the Government violated Petitioner's due process rights, it need not address Petitioner's other claims or any arguments related thereto.

### D. Remedy

"[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *O'Brien v. Moore*, 395 F.3d 499, 505 (4th Cir. 2005) (quoting *Preiser*, 411 U.S. at 484 and citing *Fay v. Noia*, 372 U.S. 391, 430 (1963)).   Upon finding a person is in custody in violation of the laws of the United States, a district court may grant a writ of habeas corpus and "dispose of the matter as law and justice so require."   28 U.S.C. §§ 2241(a), 2243.   The "typical remedy" for "unlawful executive detention" is release from custody.   *See Munaf v. Geren*, 553 U.S. 674, 693 (2008); *see also Preiser*, 411 U.S. at 484.

Here, Petitioner seeks immediate release or, in the alternative, "an order directing Respondents to provide him with a constitutionally adequate custody hearing."   (ECF No. 1 at 1–2.)   Conversely, the Government urges that ordering a bond hearing is the appropriate remedy because, under the INA, Petitioner has the burden to show that his release would not pose a danger to property or persons and that he is likely to appear for future proceedings.   (ECF No. 15-1 at 26–27.)   The Government's suggestion is unavailing, and immediate release is appropriate for two reasons.

First, this Court has no faith that the Government would comply with an order to hold a bond hearing.   One court recently compiled an appendix that identifies *at least* 96 court orders that ICE has violated in 74 cases since January 1, 2026.   *Juan T.R. v. Noem*, No. 26-CV-0107, 2026 WL 232015, at *1 (D. Minn. Jan. 28, 2026) ("ICE has likely violated more court orders in January 2026 than some federal agencies have violated in their entire existence.").   Even if ICE was willing to comply, "Immigration Judges lack authority to hear bond requests" by individuals,

like Petitioner, "who are present in the United States without admission" under the Government's interpretation of § 1225.   *Hurtado*, 29 I. & N. Dec. at 216.

Second, a bond hearing would be futile.   *Hurtado* also instructed that Immigration Judges lack authority "to grant bond to aliens who are present in the United States without admission." *Id.*   Despite innumerable federal court decisions holding that the Government's interpretation of § 1225 is unconstitutional, Immigration Judges have been instructed to continue to apply *Hurtado*. Further, former legal counsel to ICE Headquarters in Washington, D.C. and former "Assistant Chief Counsel for ICE in Virginia," has attested to his firsthand observation and experience that, since the beginning of January 2026, detainees "who were granted federal habeas relief and ordered § 1226(a) bond hearings are now being systematically denied bond based on rationales that would not have been deemed sufficient weeks earlier," in what "appears to be a systematic effort to nullify the constitutional protections that federal courts have recognized and enforced through habeas corpus."   (ECF No. 24-1 at ¶¶ 26, 32 (declaration of Jorge E. Artieda under penalty of perjury pursuant to 28 U.S.C. § 1746).)   Thus, there is little chance the Government would actually hold a bond hearing, and there is no chance any hearing that occurred would comport with due process.

Accordingly, the Court **ORDERS** Petitioner's immediate release.   *See Larrazabal-Gonzalez*, 2026 WL 221706, at *5 ("There is no process to await. The Constitution requires release."); *accord Cordoba*, 2025 WL 3228945, at *9 (collecting cases of "courts across the country [that] have ordered the immediate release of detainees in similar situations" and ordering the release of a petitioner who challenged his detention without a bond hearing); *Yao v. Almodovar*, No. 25 CIV. 9982, 2025 WL 3653433, at *12 (S.D.N.Y. Dec. 17, 2025) (same).

## IV.    CONCLUSION

This Court is entrusted to interpret the law.    In this case, the law is clear: the Government violated Petitioner's due process rights.    It is appalling that the Government insists that this Court should redefine or completely disregard the current law as it is clearly written.

A hypothetical posed at the Show Cause Hearing demonstrates the dystopian absurdity that could stem from the Government's incorrect, unfounded interpretation of the law.    *By the Government's own admission*, its position is that if an ICE officer made a mistake and, pursuant to § 1225, detained somebody who was legally in the United States, that detainee would not be entitled to a bond hearing.    Instead, that detainee—who is confined to a jail cell and may not have a mastery of the English language—could only have their case heard by a neutral judicial officer if they were somehow able to file a habeas petition with a Court of Appeals or the District Court of D.C.

This concession should concern everyone.    A threat to anyone's constitutional rights is a threat to us all.    Today, immigrants are being detained without due process.    Tomorrow, under the Government's interpretation of the law, American citizens could be subject to the same treatment.    This Court will not allow such an unraveling of the Constitution.

For the reasons discussed above, the Government's Motion to Dismiss, (ECF No. 15-1), is **DENIED**, and the Petition for Writ of Habeas Corpus, (ECF No. 1), is **GRANTED**.    Further, Respondents are **ORDERED** to **RELEASE PETITIONER IMMEDIATELY** from civil immigration custody, and Respondents are **PROHIBITED** from re-arresting and detaining Petitioner pending further order of this Court.

   **IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record, any unrepresented party, and the United States Attorney's Office for the Southern District of West Virginia.

ENTER:        February 4, 2026

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE